**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, STEVENS, JJ.**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : No. 666 CAP |
| | : |
| Appellee | : Appeal from the Judgment of Sentence |
| | : entered on 06/11/2012 in the Court of |
| | : Common Pleas, Criminal Division of |
| v. | : Lancaster County at No. |
| | : CP-36-CR-0002879-2010 (post-sentence |
| | : motions denied on 07/17/2012 with order |
| JAKEEM LYDELL TOWLES, | : entered on 07/18/2012) |
| | : |
| Appellant | : ARGUED:   September 10, 2013 |

**OPINION**

**MR. JUSTICE EAKIN**                    **DECIDED:   SEPTEMBER 22, 2014**

This is a direct appeal from a death sentence imposed after a jury convicted appellant of first degree murder.   At the penalty phase, the jury found one aggravating circumstance and multiple mitigating circumstances, determined the aggravating circumstance outweighed the mitigating circumstances, and sentenced appellant to death.   For the following reasons, we affirm.

Appellant and Antwain Robinson took a bus from Lancaster to Columbia to visit appellant's cousin, Tyrone Hunter, and to attend a local rap performance at a venue near Hunter's apartment.   Appellant and Robinson drank alcohol and smoked marijuana throughout the night, walking between Hunter's apartment and the venue several times. At some point, appellant took Hunter's handgun from his apartment and hid it in a nearby alley.   At the venue, appellant interrupted Cornell Stewart and John Wright's rap performance by grabbing Wright's microphone.   As a result, appellant and Wright got

into a physical altercation wherein Wright hit appellant at least once. Security separated them, and escorted appellant and Robinson out the front door and Wright and Stewart out the back door.

Appellant immediately retrieved the handgun he hid earlier, went behind the venue, and fired three shots at Wright and Stewart. One of the shots fatally struck Stewart in the head. Appellant and Robinson fled the scene and asked a friend for a ride to Lancaster. During the trip, appellant made incriminating statements to all occupants of the vehicle, including Robinson, their friend, and two other women, and instructed them not to talk.

Appellant was charged with Stewart's homicide, the attempted homicide of Wright, and unlawful possession of a firearm. The unlawful possession charge was severed for trial. The Commonwealth filed notice of an aggravating circumstance and intent to seek the death penalty. Appellant filed a pre-trial motion seeking suppression of any evidence relating to his use and handling of Hunter's handgun on occasions prior to the night of the murder and evidence of an unrelated altercation days earlier during which he sustained an injury to his lip. The trial court denied the motion.

During voir dire, defense counsel objected to the trial court's striking of one potential juror for cause and raised a Batson[1] challenge to each of the Commonwealth's four peremptory challenges to exclude jurors. The trial court overruled those objections.

At trial, appellant's defense theory was to negate specific intent to kill by arguing he was in the heat of passion from the altercation with Wright and also had diminished capacity due to voluntary intoxication. Appellant sought to admit a report from his expert, a toxicologist; the report contained appellant's detailed account of his alcohol and drug consumption on the night of the murder. The expert was also prepared to testify about

---

[1] Batson v. Kentucky, 476 U.S. 79 (1986).

all the facts in his report, including appellant's statements. The Commonwealth brought a motion in limine to exclude the report and preclude the expert from testifying to any of appellant's statements. Defense counsel objected, asserting the expert should be permitted to testify about all the facts on which he relied in rendering his opinion regarding the psychological and physiological effects of appellant's alcohol and drug consumption, including appellant's statements. The trial court granted the Commonwealth's motion and limited defense counsel to using hypothetical questions based on record evidence.

Appellant also requested the trial court instruct the jury on the distinct definitions of "premeditation" and "deliberation," and submitted two suggested instructions defining each term. The trial court declined to follow appellant's points for charge and instead relied on the Pennsylvania Suggested Standard Criminal Jury Instructions.

The jury convicted appellant of first degree murder and attempted homicide. In the penalty phase, the jury found one aggravating circumstance — in the commission of the murder, appellant created a grave risk of death to another person in addition to Stewart. See 42 Pa.C.S. § 9711(d)(7). Although one or more jurors found various factors relating to the circumstances of the offense and appellant's character and criminal history supported the "catch-all mitigator," see id., § 9711(e)(8), the jury unanimously sentenced appellant to death. Appellant timely filed a post-sentence motion to modify his sentence to life imprisonment, alleging the jury failed to check the blank on the verdict slip indicating the aggravating circumstance outweighed the mitigating circumstances. The trial court denied the motion, finding the jury meaningfully weighed the mitigating factors against the sole aggravating factor as indicated by the individual polling of the jury on the record. Appellant timely appealed to this Court, raising the following claims of error:

> 1. Did not the [trial] court err in challenging a juror for cause sua sponte when the juror, although expressing a preference for imposing a life

sentence, never indicated that she was incapable of imposing a death sentence under all circumstances?

2. Did the trial court improperly permit the dismissal of four female jurors who were either African-American or Hispanic after a Batson challenge by defense counsel, where the Commonwealth did not provide legitimate, race-neutral and gender-neutral reasons for exercising peremptory challenges to remove them from the jury?

3. Did the trial court err in permitting the Commonwealth to introduce a string of "prior bad act" evidence detailing [appellant]'s prior, unrelated interest in the handgun used to kill the decedent and referring to an unrelated beating that [appellant] sustained three days prior to his killing the decedent?

4. Did the [trial] court violate the terms of Pa.R.E. 703 by preventing [appellant]'s expert witness, a medical doctor and toxicologist, from referring to all the facts on which he reasonably relied in forming his conclusions as to the effects of [appellant]'s drug and alcohol use on the date of the charged offense and by requiring such expert witness thereby to amend his conclusions in a manner that negatively affected their impact on the legal defenses which [appellant] proffered at trial?

5. Did not the [trial] court err in refusing to instruct the jury, as requested by [appellant], with respect to the distinct meanings of the concepts of "premeditation" and "deliberation" necessary to sustain a conviction for murder in the first degree?

6. Was not the jury's death verdict invalid under 42 Pa.C.S. § 9711, Pa.R.Crim.P. 807 and 808, and various constitutional provisions, where the jury on the written verdict slip failed to set forth the specific statutory finding upon which the death sentence was based?

Appellant's Brief, at 6-7.

## I.   SUFFICIENCY OF EVIDENCE FOR FIRST DEGREE MURDER CONVICTION

We begin by reviewing the sufficiency of the evidence for appellant's first degree murder conviction.   "In all cases in which the death penalty is imposed, it is this Court's duty to review the record to ensure the evidence sufficiently supports the first degree murder conviction[.]"   Commonwealth v. Brown, 987 A.2d 699, 705 (Pa. 2009) (citations omitted).   In sufficiency review, "we must determine whether the evidence admitted at

trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as the verdict winner, supports the jury's finding of all of the elements of the offense beyond a reasonable doubt." Commonwealth v. Champney, 832 A.2d 403, 408 (Pa. 2003) (citation omitted).

The elements of first degree murder exist where the Commonwealth proves: (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with malice and specific intent to kill. See 18 Pa.C.S. § 2502(a); Commonwealth v. Arrington, 86 A.3d 831, 840 (Pa. 2014) (citation omitted). At trial, the only disputed element was whether appellant had the requisite malice and intent to kill. For first degree murder, "an intentional killing" is a "willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). In other words, first degree murder is a killing with specific intent. See Commonwealth v. Randolph, 873 A.2d 1277, 1281 (Pa. 2005) (citation omitted). The fact-finder may infer malice and specific intent to kill based on the defendant's use of a deadly weapon upon a vital part of the victim's body. Arrington, at 840 (citation omitted).

We find the Commonwealth provided sufficient evidence to prove each element of first degree murder beyond a reasonable doubt. Specifically, it is undisputed the shooting took place several minutes after the earlier altercation with Wright and Stewart, during which appellant left the venue out the front door, retrieved the handgun he hid earlier in the night, went behind the venue, and pointed and fired three shots at them, killing Stewart. The record evidence suggests a presence of mind belying appellant's contentions he lacked specific intent. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence was sufficient to support a finding that Stewart was unlawfully killed, appellant killed him, and he acted with malice and specific intent to kill.

## II. JURY SELECTION

### A. Striking Juror 32 For Cause

Appellant notes the distinction between a juror who makes general objections to the death penalty versus one who unequivocally states she would automatically vote against the death penalty without regard for the law or the facts of the case. Appellant's Brief, at 32-33 (quoting Commonwealth v. Weeden, 322 A.2d 343, 347 (Pa. 1974) (jurors may not be excluded for cause simply because they voiced general objections to death penalty)). Appellant characterizes Juror 32 as one who made general objections, stating she "expressed a preference for imposing a sentence of life imprisonment[,]" id., at 31, but "never indicated that she was incapable of imposing a sentence of death under all circumstances[,]" id., at 33. Although Juror 32 repeatedly expressed her own individual preference, appellant notes she nonetheless indicated she could follow the court's instructions. Therefore, he argues the trial court erred by striking Juror 32 for cause rather than forcing the Commonwealth to use one of its peremptory challenges.[2] The Commonwealth avers Juror 32 unequivocally stated she could not impose the death penalty and the trial court did not abuse its discretion in striking her for cause.

During voir dire, Juror 32 was questioned extensively by defense counsel, the Commonwealth, and the trial court as to whether she would be able to follow the law and impose a death sentence if the facts of the case met the statutory criteria for such a penalty. See N.T. Voir Dire, 4/30-5/4/12, at 367-83. Juror 32 generally stated she could follow the law and would listen to argument with an open mind. Id., at 378-79. However, her responses as a whole unquestionably demonstrated an opposition to the

---

[2] Jurors may be excluded for cause when their views on the death penalty would prevent or substantially impair their performance of duties in accordance with their instructions and oath, and the trial court is within its discretion in excluding jurors who expressed such views. Commonwealth v. Chmiel, 30 A.3d 1111, 1176 (Pa. 2011) (citations omitted).

death penalty. During voir dire, she said, "I would rather give the life sentence than death. … I'd just rather not do that, send him to death." Id., at 371. When asked, "[A]re you telling us that you would have a difficult time, even if justified by law, standing and saying yes, the sentence here should be death?[,]" she replied, "Probably, yeah, then I would, yes." Id., at 372. Additionally, when asked if she had personal beliefs that would make her incapable of imposing a death sentence, she replied, "Okay. Yes, I can't do that. … I cannot put him to death, no." Id., at 375. When defense counsel further explained a death sentence is not automatic upon conviction for first degree murder, she stated she "would give him life instead of death probably[,]" id., at 381, and when the court asked, "[I]f the law says ... you are required to vote for death, ... are you still going to say, no, it's a life prison sentence, regardless of what the testimony or the evidence was during the penalty phase?[,]" she again concluded she "would probably still send him to life[,]" id., at 383. As a result, the trial court determined its dismissal for cause was warranted.

"[T]he purpose of voir dire is to ensure the empanelling of a fair and impartial jury capable of following the instructions of the trial court." Commonwealth v. Lesko, 15 A.3d 345, 412-13 (Pa. 2011) (citation omitted). The trial court must be given great deference in ruling on challenges for cause, as it "not only hears the questions and answers during voir dire, but also observes the demeanor of the veniremen and assesses their credibility and ability to be impartial." Commonwealth v. Smith, 540 A.2d 246, 256 (Pa. 1988) (citations omitted). We have held the decision to exclude a juror who expressed reservations about imposing the death penalty is within the trial court's discretion and will be reversed only for an abuse of discretion. Commonwealth v. Philistin, 53 A.3d 1, 11 (Pa. 2012) (citation omitted).

Appellant cites Weeden to posit "'that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding the venireman for

cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.'" Weeden, at 347 (quoting Witherspoon v. Illinois, 391 U.S. 510, 522 (1968)). However, Weeden further held:

> it was not error to exclude for cause "[veniremen] who made unmistakably clear (1) that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude towards the death penalty would prevent them from making an impartial decision as to the defendant's guilt."

Id. (emphasis omitted) (quoting Witherspoon, at 522 n.21).

This Court noted the United States Supreme Court's clarification of Witherspoon, setting the standard for determining a strike for cause as:

> "whether the jurors' views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' [I]n addition to dispensing with Witherspoon's reference to 'automatic' decision making, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.'"

Commonwealth v. Buehl, 508 A.2d 1167, 1175-76 (Pa. 1986) (quoting Wainwright v. Witt, 469 U.S. 412, 424 (1985)).

Although appellant contends Juror 32 merely voiced general objections to the death penalty and stated she could follow the law, the record shows otherwise — Juror 32 repeatedly expressed she would sentence appellant to life even if the law required a death sentence. Juror 32's views need not be expressed with "unmistakable clarity" or automatic, unequivocal certainty, see id. (citation omitted), but those views were clearly discernable here. Accordingly, we conclude the trial court did not abuse its discretion in determining Juror 32's views would prevent or substantially impair her ability to perform in accordance with her oath, and hence striking her on that basis.

## B. Batson Challenges

Appellant argues the Commonwealth used race-based and gender-based peremptory challenges to exclude Jurors 25, 31, 45, and 86 in violation of Batson.[3]   In support of his gender discrimination claims, appellant relies on the number of female jurors struck, noting the Commonwealth used 14 out of 19, or 73.7%, of its total peremptory challenges to exclude females.   Appellant also alleges the Commonwealth's reasons for striking Jurors 25 and 45 were pretextual, essentially contesting the trial court's credibility determinations regarding the Commonwealth's non-discriminatory reasons for its peremptory challenges.   As a result, appellant requests a new trial.

The Commonwealth argues appellant failed to make a prima facie case[4] for racial discrimination and asserts appellant waived his gender discrimination claims by failing to raise them during voir dire.   Alternatively, the Commonwealth contends race-neutral and

---

[3] Appellant fails to make any particularized argument regarding Jurors 31 and 86, but merely alleges generally that they were struck as a result of race-based and gender-based peremptory challenges.   See Appellant's Brief, at 34-37.

[4] When defense counsel objected to the Commonwealth's peremptory challenges, the prosecutor responded by first arguing the defense had failed to make a prima facie showing of discrimination.   The trial court did not explicitly conclude the defense met its burden, but did so implicitly by conducting an inquiry under the second prong of Batson, requesting the prosecutor's reasoning for the strikes.   The trial court accepted the prosecutor's non-discriminatory reasons, finding no purposeful discrimination and moving on to question the next potential juror.   In Commonwealth v. Harris, 817 A.2d 1033 (Pa. 2002), we noted the plurality decision by the United States Supreme Court in Hernandez v. New York, 500 U.S. 352 (1991) (plurality opinion), which offered that "'[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot.'" Harris, at 1044 (quoting Hernandez, at 359).   Although this Court admitted the plurality opinion did not compel us to deem the preliminary prima facie inquiry as moot in similar circumstances, we found such language "gives us pause[.]"   Id.   Therefore, we addressed whether the appellant carried his ultimate burden of proving the Commonwealth struck jurors based on race without first deciding a prima facie case of purposeful discrimination.   See id.; see also Commonwealth v. Edwards, 903 A.2d 1139, 1154 n.16 (Pa. 2006).   We will follow the same process here.

gender-neutral reasons were provided for excusing Jurors 25 and 45,[5] and the record supports the trial court's denial of appellant's Batson challenges.

In response to appellant's Batson challenge to Juror 25, the Commonwealth listed non-discriminatory reasons, stating she: (1) indicated she would be less likely to believe testimony from a police officer; (2) expressed her opposition to the death penalty; (3) responded on her written jury questionnaire that her religious and moral views might interfere with her ability to be fair and impartial; and (4) stated she intended to hold the Commonwealth to a higher burden of proof than beyond a reasonable doubt. N.T. Voir Dire, 4/30-5/4/12, at 308-09. As to Juror 31, the Commonwealth noted: (1) her strong preference for not issuing a death sentence where the accused and victim were both adult males; (2) her comments appellant was too young for the death penalty; and (3) her brother's incarceration, of which she would not provide any details but disclosed she maintains a close relationship with him. Id., at 366-67. Concerning Juror 45, the Commonwealth gave its non-discriminatory reasons, stating she: (1) indicated on her written jury questionnaire that she would be less likely to believe the testimony of a police officer, and her responses to related questioning during voir dire were equivocal; (2) responded equivocally as to whether she would acquit appellant to avoid issuing him the death penalty; (3) commented on how appellant had to fight the case; and (4) expressed affinity toward defense counsel and smiled at appellant. Id., at 566-68. For Juror 86, the Commonwealth responded: (1) she was uneasy in issuing the death penalty where the victim was not elderly or a child; (2) the prosecutor was familiar with some unspecified conduct by her husband; and (3) she had hesitancies and equivocations in her responses during voir dire, especially with regard to death penalty questions. Id., at 715-17.

---

[5] The Commonwealth's arguments do not mention Jurors 31 and 86, but only reference Jurors 25 and 45, seemingly in response to appellant's limited argument supra, n.3. See Commonwealth's Brief, at 10-13.

The trial court denied all four of appellant's <u>Batson</u> challenges. In its Rule 1925(a) opinion, the court noted appellant waived all gender-based <u>Batson</u> claims because he only objected on the basis of race during <u>voir dire</u> and never alleged gender discrimination. <u>See</u> Trial Court Opinion, 10/23/12, at 10. We disagree as to Jurors 45 and 86. Citing <u>Batson</u>, defense counsel objected to the Commonwealth's peremptory challenges to exclude Jurors 45 and 86, and although he did not explicitly allege gender discrimination, the record clearly shows his emphasis on gender in support of his <u>Batson</u> challenge, noting Juror 45 was "the second <u>female</u> minority juror" to be stricken, N.T. <u>Voir Dire</u>, 4/30-5/4/12, at 568 (emphasis added), Juror 86 was "the fourth <u>woman</u> of color" to be stricken, <u>id.</u>, at 714 (emphasis added), and alleging there "is the pattern ... that minority <u>females</u> are being systematically stricken as jurors based on their race[,]" <u>id.</u> (emphasis added). However, as to Jurors 25 and 31, defense counsel solely objected on the basis of race and never alleged gender-based discrimination, nor did he reference or emphasize the gender of the jurors stricken; therefore, the trial court was correct in finding appellant waived his gender-based challenge regarding those two jurors. <u>See</u> Pa.R.A.P. 302(a).

The trial court further determined, even if appellant's gender-based claims were preserved, the Commonwealth gave sufficient race-neutral and gender-neutral reasons for its peremptory challenges and demonstrated no purposeful discrimination. <u>See</u> Trial Court Opinion, 10/23/12, at 10-12.

In <u>Batson</u>, the United States Supreme Court held the Fourteenth Amendment's Equal Protection Clause forbids the prosecution from using its peremptory challenges to exclude potential jurors based solely on their race. <u>See</u> <u>Batson</u>, at 89. In <u>Harris</u>, this Court set forth the second and third prongs for analyzing <u>Batson</u> claims:

> The second prong of the <u>Batson</u> test, involving the prosecution's obligation to come forward with a race-neutral explanation of the challenges

once a prima facie case is proven, does not demand an explanation that is persuasive, or even plausible. Rather, the issue at that stage is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.

If a race-neutral explanation is tendered, the trial court must then proceed to the third prong of the test[.] ... It is at this stage that the persuasiveness of the facially-neutral explanation proffered by the Commonwealth is relevant.

Harris, at 1043 (internal citations and quotations omitted) (emphasis in original). We have noted the United States Supreme Court's extension of Batson to encompass challenges on the basis of gender. See Commonwealth v. Spotz, 896 A.2d 1191, 1211 (Pa. 2006) ("'[I]ntentional discrimination on the basis of gender by state actors violates the Equal Protection Clause[.]'" (quoting J.E.B. v. Alabama, 511 U.S. 127, 130-31 (1994))).

The trial court should consider the totality of circumstances when determining whether the prosecutor acted with discriminatory intent or engaged in purposeful discrimination. Commonwealth v. Williams, 980 A.2d 510, 531-32 (Pa. 2009) (citations omitted). Great deference must be given to the trial court's finding as to an absence of discriminatory intent in peremptory challenges, and this finding will not be overturned unless clearly erroneous. Spotz, at 1212 (quoting Commonwealth v. Jones, 668 A.2d 491, 520 (Pa. 1995)). Such deference is warranted because the trial court is in the position to make credibility determinations when viewing the demeanor of the prosecutor exercising the peremptory challenges. Williams, at 531 (citation omitted).

After reviewing the record and the relevant legal principles, we conclude the trial court's finding is supported by the record and free of legal error. Thus, appellant has failed to prove the trial court erred in denying his Batson claims.

## III. GUILT PHASE CLAIMS

### A. Prior Acts

<u>Prior Use of Hunter's Handgun</u>

Appellant concedes it was permissible to allow the jury to hear evidence that he lawfully used Hunter's handgun on one prior occasion, knew where Hunter stored the handgun, and stole the handgun on the night of the murder and hid it in the alleyway. However, he argues the jury should have received only this limited evidence, not that he asked to borrow Hunter's handgun on multiple occasions and once fired it from a moving vehicle. Appellant contends this was irrelevant, inadmissible character evidence. Appellant further contends this evidence, even if relevant, should be excluded because its probative value is outweighed by the potential prejudice.

The Commonwealth responds by highlighting it bore the burden of proving specific intent to kill and appellant's state of mind; therefore, evidence proving appellant's familiarity with the handgun was relevant and admissible to prove his intent and absence of mistake or accident. The Commonwealth also asserts evidence demonstrating appellant asked Hunter to borrow his handgun on prior occasions does not constitute "prior bad acts" evidence,[6] as there was no evidence of appellant's inability to legally

---

[6] The Commonwealth's argument that this evidence is not "prior bad acts" evidence since it does not involve criminal acts or misconduct is without merit. The term "prior bad acts" commonly refers to Rule 404(b), which does not apply only to acts that are "bad" or immoral in nature. Rule 404(b) makes no such distinction. It not only concerns prior crimes or "bad" conduct but also relates to other acts or conduct.

Rule 404(b), entitled "Crimes, Wrongs or <u>Other</u> <u>Acts</u>[,]" provides:

> (1) <u>Prohibited Uses</u>. Evidence of a crime, wrong, or <u>other</u> <u>act</u> is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character.

> (2) <u>Permitted Uses</u>. This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this

(continued…)

possess a firearm presented to the jury since the unlawful possession charge was severed from the murder trial. The Commonwealth further contends if this is considered "prior bad acts" evidence, it is admissible under the res gestae exception as part of a natural development of the facts of this case, asserting appellant's prior requests to borrow Hunter's handgun may be introduced to show appellant committed a murder with that same firearm.

"'The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion.'" Commonwealth v. Johnson, 42 A.3d 1017, 1027 (Pa. 2012) (quoting Commonwealth v. Sherwood, 982 A.2d 483, 495 (Pa. 2009)). "'An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.'" Id. (quoting Sherwood, at 495).

The trial court found appellant's prior requests to see and use Hunter's handgun — the same handgun used to kill Stewart — were admissible pursuant to Pa.R.E. 404(b) to show appellant knew of, had access to, and was familiar with the handgun. Trial Court Opinion, 10/23/12, at 5. The court also found the probative value of the evidence outweighed its prejudicial effect "where the charge for unlawful possession of a firearm was severed from the homicide charges and the jury was unaware of [appellant]'s inability to possess a firearm." Id.

---

(…continued)
      evidence is admissible only if the probative value of the evidence outweighs
      its potential for unfair prejudice.

Pa.R.E. 404(b)(1)-(2) (first and third emphasis added).

In deciding admissibility of other acts, "the trial court is obliged to balance the probative value of such evidence against its prejudicial impact." Sherwood, at 497 (citations omitted). This Court has also recognized the res gestae exception to Rule 404, allowing evidence of other acts to be admitted to tell "'the complete story[.]'" Commonwealth v. Williams, 896 A.2d 523, 539 (Pa. 2006) (citation omitted).

The evidence challenged by appellant was admissible to prove intent, preparation, knowledge, absence of mistake, and lack of accident. Appellant claimed at trial he lacked the specific intent to kill. The admitted prior acts evidence demonstrated appellant knew where the handgun was located, had the ability to retrieve it, and was familiar with it due to his prior use of it, thereby refuting any claim of lack of specific intent or mistake or accident due to unfamiliarity with the handgun. Additionally, the prior acts were relevant for res gestae purposes to explain the history and course of events on the night of the murder, and appellant's prior requests to see and use Hunter's handgun were necessary to "complete the story" as to how he had access to the handgun, removed it from Hunter's apartment without his knowledge, and hid it outside of the venue, enabling him to retrieve it moments after his altercation with Wright. See Commonwealth v. Dillon, 925 A.2d 131, 139 (Pa. 2007) (res gestae evidence admissible to explain events surrounding criminal conduct and resulting prosecution so case presented to jury does not appear in vacuum). Furthermore, the jury never learned of appellant's inability to legally possess a firearm; therefore, the probative value of this evidence outweighed its prejudicial effect. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

Pre-existing Facial Injury

Appellant avers evidence of his pre-existing facial injury was irrelevant and the trial court erred by admitting testimony to demonstrate the injury existed prior to the night of

the murder. Appellant argues such evidence was irrelevant since he never claimed the facial injury was caused by Wright, and to the extent such could be found relevant, its relevance was outweighed by its undue prejudice. Further, appellant alleges the evidence permitted the jury to assume he had been in a recent fight and to infer he must have asked for the handgun not simply to use it but to retaliate against the individual who caused the facial injury.

The Commonwealth notes it did not present evidence of appellant's involvement in a fight just days prior to the murder, but limited its proffer and questioning to appellant's appearance prior to the altercation. The Commonwealth argues appellant's appearance was admissible to rebut his claims that he suffered a severe beating from Wright and was part of the natural development of the facts surrounding the case.

The trial court held the evidence was admissible to rebut appellant's claim Wright inflicted the injury just prior to the shooting. The court highlighted the Commonwealth did not elicit testimony regarding the prior altercation but limited its questioning to the appearance of appellant's face prior to his fight with Wright, in response to which Hunter testified appellant already had a scab on his lip when he arrived at Hunter's apartment earlier that night. See Trial Court Opinion, 10/23/12, at 6 (citing N.T. Trial, 5/7-11/12, at 247). The court also found the probative value of the evidence outweighed its prejudicial effect since the jury only heard limited testimony as to appellant's appearance prior to the altercation with Wright, not how he sustained the facial injury. Id. The court further stated, even if admitting this evidence was error, it was nonetheless harmless. Id.

The trial court did not err in this regard. Hunter's testimony about appellant's pre-existing lip injury was admissible to rebut appellant's claims that Wright caused the injury. Whether appellant was injured during his altercation with Wright was indicative of the severity of the beating, which, in turn, was probative as to whether appellant was

operating under the heat of passion required to reduce his culpability. The jury never heard how appellant sustained this pre-existing injury; it only heard Hunter's testimony as to appellant's appearance prior to his fight with Wright, which did not necessarily imply he sustained the injury from another prior fight but simply indicated Wright did not cause it. The evidence did not impugn appellant's character, nor was it prejudicial. Accordingly, the trial court did not abuse its discretion in admitting this evidence.

## B. Expert's Report and Testimony

Appellant argues the trial court erred by refusing to permit his expert to testify about all the facts on which he relied in rendering his opinion as to the psychological and physiological effects of appellant's alcohol and drug consumption, and a concussion he might have sustained, on the night of the murder. Appellant notes he gave a detailed account of the entirety of his consumption during interviews with his expert and argues his expert reasonably relied on these statements in creating his report. Appellant contends the trial court improperly excluded the report and precluded his expert from testifying about appellant's statements contained therein, and it erred in only permitting his expert to testify hypothetically based on record evidence. Appellant posits the trial court's limiting his expert to hypotheticals substantially diluted his expert's opinion on appellant's psychological and physiological functions at the time of the incident.

The Commonwealth asserts the trial court did not err in excluding appellant's statements from the expert's report and properly found no toxicology expert would reasonably rely on a defendant's self-serving statements in forming an opinion. The Commonwealth argues the expert's report was simply an attempt by appellant to submit his self-serving statements to the jury without having to testify himself. The Commonwealth contends even if error is found, such error is harmless since appellant

was still permitted to question his expert in hypothetical form, which allowed the expert to assume the facts contained in appellant's statements.

At trial, defense counsel objected under Pa.R.E. 703[7] to the Commonwealth's motion in limine to exclude the expert's report. The trial court precluded admission of the report and testimony as to appellant's statements contained therein as hearsay. See N.T. Trial, 5/7-11/12, at 443-45. The court limited defense counsel to using hypothetical questions based on record evidence. Id., at 445. The trial court later admitted the expert's opinion relative to the psychological and physiological effects of alcohol and drugs, and an opinion relative to concussions. Id., at 463-64.

In its Rule 1925(a) opinion, the trial court not only found the report was based entirely on appellant's self-serving hearsay statements, but it also stated, pursuant to Pa.R.E. 703, "nothing in the report would have been of the type reasonably relied upon by a toxicologist in rendering an opinion to a reasonable degree of medical certainty regarding the effect of drug[s] and alcohol on [appellant] and an alleged possible concussion on the night in question." Trial Court Opinion, 10/23/12, at 13. The trial court noted appellant did not testify, and it found that introducing appellant's account to the jury for its truth through expert testimony or a report risked confusing and misleading the jury, which outweighed any minimal probative value of the facts contained therein. Id.

---

[7] Rule 703 states:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted.

Id.

Decisions regarding the admission of expert testimony are left within the trial court's sound discretion, and this Court will not disturb such decisions absent a clear abuse of discretion. Commonwealth v. Galvin, 985 A.2d 783, 801 (Pa. 2009) (citation omitted). An expert opinion may be based on inadmissible facts or facts not in evidence, including other expert opinions and hearsay statements, as long as such facts are of a type reasonably relied on by experts in that profession. See Pa.R.E. 703; see also Commonwealth v. Chambers, 599 A.2d 630, 639 (Pa. 1991) (citations omitted). Implicit in Rule 703 is the trial court's sound discretion under Pa.R.E. 104(a) to make a preliminary determination as to whether the particular underlying facts are of a kind reasonably relied upon by experts in the particular field. See id., 703 cmt. Rule 705 of Pennsylvania's Rules of Evidence mandates, "If an expert states an opinion[,] the expert must state the facts or data on which the opinion is based." Id., 705. However, an expert may not act as a mere conduit of hearsay or transmitter of extrajudicial information. See id., 703 cmt. ("An expert witness cannot be a mere conduit for the opinion of another ... [and] may not relate the opinion of a non-testifying expert[.]").

The trial court did not abuse its discretion in finding appellant's self-serving statements were not of a type reasonably relied on by experts in toxicology. There is a distinction between an expert using basic facts provided by laymen to form an expert opinion, versus one who simply parrots out-of-court statements in court, thereby acting as a conduit for hearsay. In this case, there were no toxicology screens or tests performed on appellant. The expert's report was simply appellant's firsthand narrative of the events on the night of the murder and a detailed account of his drug and alcohol consumption that night. Had the expert been permitted to testify to the facts contained in his report, he would have been merely relaying testimony appellant would have given had he taken the stand. Pennsylvania's Rules of Evidence do not provide a mechanism for a criminal

defendant to decline to testify and to avoid the rules of evidence by using an expert witness to introduce his story into the record. Accordingly, it was proper for the trial court to exclude the report from the jury's consideration and to prevent appellant's statements from reaching the jury via the expert's testimony.

Moreover, appellant has failed to demonstrate he suffered prejudice from the trial court's decision, as his expert was permitted to testify by answering hypotheticals. These hypotheticals were comprehensive of appellant's account in the report regarding his drug and alcohol consumption that night, including the type and amount consumed at the times appellant alleged, and the events that occurred that night, including details of appellant's fight with Wright — the expert was asked to opine on the effects of three, hard, closed-fist punches to the head. See N.T. Trial, 5/7-11/12, at 464-82. The expert rendered an opinion of appellant's psychological and physiological functions reflecting the facts stated in his report; therefore, were there any error in precluding its admission, it would be harmless. See Commonwealth v. Petroll, 738 A.2d 993, 1005 (Pa. 1999) (citation omitted).

## C. Jury Instructions

At trial, appellant requested the court instruct the jury on the distinct definitions of "premeditation" and "deliberation." In support of his request, appellant submitted two suggested instructions on the definitions of "premeditation" and "deliberation" based on descriptions found in case law, legal treatises, and dictionaries.[8] The trial court declined

---

[8] Appellant's first suggested instruction stated:

Before you can find [appellant] guilty of [m]urder in the [f]irst [d]egree, you must find beyond a reasonable doubt that he acted with premeditation and deliberation. "Premeditation" is the process of thinking about a proposed killing before engaging in the homicidal conduct. "Deliberation" is the process of carefully weighing such matters as the wisdom of going ahead

(continued…)

to use appellant's suggestions, and appellant objected.  <u>See</u> N.T. Trial, 5/7-11/12, at 556-57.

Appellant avers the trial court declined to define "deliberate" in its jury instructions and gave a definition of "premeditated" that was not as clear as the one he requested. However, he admits the trial court's instructions were "substantially based" on the Pennsylvania Suggested Standard Criminal Jury Instructions, which also do not provide a specific definition for "deliberation."  Appellant's Brief, at 54-55.  The crux of appellant's argument is not that the trial court's instructions departed from the Suggested Standard Criminal Jury Instructions for first degree murder, but that the Suggested Standard Criminal Jury Instructions themselves are insufficient.  In support of his argument, his brief includes a six-page treatise on the history of the definition of first degree murder in

---

(…continued)

> with the proposed killing, the manner in which the killing will be accomplished, and the consequences which may be visited upon the killer if he [is] apprehended. "Deliberation" is present if the thinking, i.e., the "premeditation," is being done in such a cool mental state, under such circumstances, and for such a period of time as to permit a "careful weighing" of the proposed decision.

Defendant's Points for Charge, 5/17/12, at 18 (citations omitted).

The second suggested instruction read:

> [A] killing is with specific intent to kill if it is willful, deliberate, and premeditated. The word deliberate is not defined in the statute. Therefore, this word should be used according to its common usage. Black's Law Dictionary in the 7th [e]dition defines it as, quote, intentional, premeditated, fully considered, unimpulsive, slow in deciding. Webster defines it as ["]to consider, weigh well, carefully thought out or formed, premeditated, done on purpose."

<u>Id.</u> (citation omitted).

Pennsylvania and legal use of the words "deliberation" and "premeditation." See id., at 54-60.

"When reviewing a challenge to a jury instruction, we review the charge as a whole to ensure it was a fair and complete statement of the law." Johnson, at 1036 (citation omitted). Trial courts possess great discretion in phrasing jury instructions so long as the law is clearly, adequately, and accurately presented to the jury. Commonwealth v. Eichinger, 915 A.2d 1122, 1138 (Pa. 2007) (citation omitted); Philistin, at 12 (citation omitted). "[A] trial court need not accept counsel's wording for an instruction, as long as the instruction given correctly reflects the law." Commonwealth v. Williams, 732 A.2d 1167, 1187 (Pa. 1999) (citation omitted). The trial court's instruction in this case thoroughly and accurately represented the law on first degree murder; thus, there was no error. Insofar as appellant asks us to critique the subtleties of the language in the Pennsylvania Suggested Standard Jury Instructions, we decline his invitation.[9]

## IV. PENALTY PHASE CLAIM

During the penalty phase, the trial court provided the jury with a three-part verdict slip. In part A, the jury was to check whether it imposed a sentence of death or life imprisonment. In part B, to be completed if it chose death, the jury was to explain the basis for that choice. Part B contained two subsections, in which the jury was to check one of two blanks indicating whether it based the death sentence on finding: (B.1) an aggravating circumstance which outweighs any mitigating circumstances; or (B.2) at least one aggravating circumstance and no mitigating circumstances. Under each subsection in part B were blanks to write in the aggravating or mitigating circumstances. In part C, to be completed if the jury chose life imprisonment, it was to explain the basis for that choice

---

[9] Appellant fails to assert Pennsylvania's Suggested Standard Jury Instructions in any way impinge upon his constitutional or other legal rights.

by checking whether: (1) no aggravating circumstance exists; or (2) the mitigating circumstances are not outweighed by the aggravating circumstance. Also in part C were blanks to write in the aggravating or mitigating circumstances. During its charge, the trial court instructed the jury on how to complete the form.

The jury completed part A by checking the "death" blank, indicating its unanimous choice to impose a death sentence. The jury then completed part B.1; the jury wrote in the aggravating circumstance it found unanimously and the mitigating circumstances any of its members found, but did not check the blank preceding part B.1.

Appellant argues the oversight invalidated the death verdict under 42 Pa.C.S. § 9711, Pa.R.Crim.P. 807 and 808, and violated the protections against cruel and unusual punishment under the Eighth Amendment to the United States Constitution and Article I, § 13 of the Pennsylvania Constitution. Appellant cites various minimally relevant decisions by the United States Supreme Court holding the uniqueness and severity of the death penalty demand heightened reliability of those verdicts. See Thompson v. Oklahoma, 487 U.S. 815 (1988); Zant v. Stephens, 462 U.S. 862, 884 (1983); Woodson v. North Carolina, 428 U.S. 280, 305 (1976). However, appellant never explains how the minor oversight invalidates the verdict, and he does not cite any authority for this proposition.

Appellant agrees the jury unanimously indicated during on-the-record polling that it found an aggravating circumstance and mitigating circumstances, weighed them, and each juror agreed with the sentence of death as a result; however, appellant contends the verdict was still invalid because the court never asked "whether the jury based its sentence of death on a specific finding that the aggravating circumstance outweighed any mitigating circumstances." Appellant's Brief, at 63 (emphasis in original).

None of appellant's arguments are compelling. The jury clearly chose death as the sentence in part A. Part B is merely explanatory of the verdict — it is not the verdict itself. It supports the conclusion that the jury followed the proper considerations when reaching its verdict. The jury clearly listed both an aggravating circumstance and mitigating circumstances on the verdict slip blanks in part B.1, the section indicating a finding that the aggravating circumstance outweighed any mitigating circumstances. There is no logical way to interpret the verdict slip other than as expressing a unanimous finding that the aggravating circumstance outweighed the mitigating circumstances. Indeed, the jury's decision to thoroughly complete part B.1 and leave the remainder of the verdict slip blank indicates its actual verdict and negates any clerical failure to check the blank next to that section. This conclusion was confirmed when the trial court polled each juror individually, and each confirmed he or she "weighed the aggravating and mitigating circumstances" and decided on a verdict of death. N.T. Sentencing, 5/14-15/12, at 188-93. Therefore, the jury's death sentence is valid.

## V. STATUTORY REVIEW

This Court must affirm the sentence of death unless we find: (i) the evidence fails to support the finding of at least one aggravating circumstance; or (ii) the sentence was the product of passion, prejudice, or any other arbitrary factor. Champney, at 417 (citing 42 Pa.C.S. § 9711(h)(3)(i)-(ii)). In the penalty phase, the jury found appellant's actions knowingly created a grave risk of death to another person in addition to the victim of the murder. See 42 Pa.C.S. § 9711(d)(7). "Sufficient evidence to support the grave risk of death aggravator exists where a nexus connects other persons in close proximity to the intended or actual victim to the zone of danger created by the defendant's actions in killing the victim." Brown, at 707 (citation omitted). It was undisputed appellant purposely shot in the direction of both Stewart and Wright, which alone supports the jury's

finding of the "grave risk of death" aggravator. Finally, appellant does not contend his conviction or sentence was the result of passion, prejudice, or any other arbitrary factors, see 42 Pa.C.S. § 9711(h)(3)(i), and our review of the record reveals no indication of such factors.

Accordingly, we affirm the verdict and the sentence of death.

The Prothonotary of the Supreme Court is directed to transmit the complete record of this case to the Governor. See id., § 9711(i).

Judgment of sentence affirmed; jurisdiction relinquished.

Mr. Chief Justice Castille, Messrs. Justice Saylor and Baer, Madame Justice Todd, and Messrs. Justice McCaffery and Stevens join the opinion.