J-S13027-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT OP 65.37**

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
|---|---|---|
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ORIALIS FIGUEROA-COLON | : | |
| | : | |
| Appellant | : | No. 2051 EDA 2022 |

Appeal from the Judgment of Sentence Entered July 13, 2022
In the Court of Common Pleas of Northampton County
Criminal Division at CP-48-CR-0000103-2020

BEFORE:   NICHOLS, J., MURRAY, J., and STEVENS, P.J.E.*

MEMORANDUM BY MURRAY, J.:                              **FILED JUNE 9, 2023**

Orialis Figueroa-Colon (Appellant) appeals from the judgment of sentence imposed after a jury found him guilty of aggravated assault, simple assault, resisting arrest, and disorderly conduct.[1]  We affirm.

During the afternoon of July 27, 2019, Easton Police Officer Jonathan Vidal (Officer Vidal) was dispatched to the 900 block of Ferry Street for a complaint of loud music at a large street party.  N.T., 5/31/22, at 79, 81. Officer Vidal "attempted to speak to [Appellant] and advise him that I just needed the music to be turned down."  *Id.* at 82.  Appellant replied, "the noise ordinance does not pertain to him," and turned the music up.  *Id.* at 84.

---

* Former Justice specially assigned to the Superior Court.

[1] *See* 18 Pa.C.S.A. §§ 2702(a)(3), 2701(a)(1), 5104, 5503(a)(1).

Officer Vidal contacted dispatch for backup, and uniformed Easton Police Officer Aaron Kinnel (Officer Kinnel) arrived in a marked police car. *Id.* at 86.

At trial, Officer Kinnel testified:

Q [The prosecutor]. Could you hear anything when you got [to the scene of the street party]?

A. As soon as I got out of my vehicle, I started to get [] verbally attacked by [Appellant]….

* * *

Q. What was being said to you?

A. A lot of things. I was being cursed at. I was told to leave, to get out of there. … [Appellant's] girlfriend or wife told me that she didn't like me and that I needed to leave. I told her that … I was there … as a backup officer and I wasn't going to leave the scene until we got it resolved.

* * *

Q. Was [Appellant] yelling directly at you?

A. He was.

Q. What was he saying? …

A. [Appellant] was cursing at me. Calling me a pussy. Saying he was going to beat my ass, things like that.

* * *

Q. And how many people approximately were in the area?

A. … I estimated 40 to 50. …

Q. How would you describe the crowd in general, their demeanor?

A. Extremely hostile towards [the officers].

* * *

Q. Did you tell anyone to turn the music down, you personally?

A. No. So when I got there, I spoke to Officer Vidal. He had told me that he tried to get [Appellant] to turn the music down and [Appellant or the partygoers] actually turned [the volume] back up. When I got there, I think [the volume] was turned back down. But [Appellant] was screaming and yelling and then cursing at me and trying to get me to fight him [].

N.T., 11/1/21, at 102-06.

The prosecutor's questioning of Officer Kinnel continued:

Q. [] Why didn't you just leave the area?

A. So I had warned [Appellant] … numerous times to stop cursing and to calm down because there [were] other families … out in the area. And … that made [Appellant] more angry, and he continued to … yell at me and curse. [In response, Officer Kinnel informed Appellant he was] … getting a ticket for disorderly conduct.

   And that did not [have] the desired effect…. [Appellant] ramped up even more and continued to scream at me. …

* * *

Q. [] Did you tell [Appellant] he was under arrest?

A. Yes. I said, Orialis, you are under arrest.

* * *

Q. And what happened?

A. [Appellant] ran.

Q. Where did he run to?

A. Up onto his porch and into his house.

* * *

Q. [] When you saw [Appellant] go towards his house after you told him he was being arrested, what happened?

A. [Appellant] ran from me. And I gave chase to try to arrest him. As I did this, [Appellant's] sister tried to stop me by … blocking me.

* * *

Q. Were there other people between that threshold and the steps and the porch blocking your access to [Appellant]?

A. … [Appellant's] sister[] grabbed my gun, along with a young girl [who] grabbed for my gun and my belt area. …

* * *

Q. [] And when you then went up to the porch … [and] got past them, what did you do?

A. [Appellant] was right inside of that main door []. And [Appellant's elderly mother] was trying to block me from being able to get into the house. So I went next to her and did the same thing that I did to [Appellant's sister when she attempted to block the officers.] I … just moved her out of my way. And that is when I tried to grab [Appellant] to effect the arrest.

Q. And … when you tried to grab [Appellant], were you able to [accomplish] the arrest?

A. No. So I grabbed ahold of one of [Appellant's] arms and **he pulled away from me violently**.

Q. And what did you do?

A. At this point, as I was trying to grab ahold of [Appellant], other family members and friends started to attack me from behind and on the side.

* * *

Q. What did you feel?

A. People … pulled my radio off, at one point. Somebody pulled me back out of the house by my hips, by my gun. …

* * *

Q. [] What did [Appellant] do at that point?

A. [A]s I was trying to grab [Appellant] and arrest him, he [and] his family members and friends started pulling on … my radio … and my gun[.] I was getting concerned for my safety…. So I took my taser out. … [Appellant] was trying to shove me out of the house.

And when I did that, somebody to my right had smacked the taser out of my hand.

Q. Do you know who that was?

A. No. I do not know.

Q. **And did you ever feel hands on your neck or shoulders**?

A. **Yes,** [**Appellant's**].

Q. [] And describe that for the jury please.

* * *

A. [Appellant] was actively trying to shove me out of the house. And when I was picking up the taser, he was … trying to push me out of the house. And … other people were pulling on me. …

* * *

Q. [] When you fired the taser [at Appellant], what happened after that?

A. … I fired it and when it didn't do what I was hoping it would do, [**Appellant**] **charged me and tackled me out of the house**.

Q. [] And how did he charge you?

A. **Violently.**

- 5 -

* * *

Q. And what happened when you were shoved out of the house?

A. **I fell down into the** … [**concrete**] **porch area**….

*Id.* at 106-18 (emphasis added); *see also id.* at 118, 120 (Officer Kinnel testifying that when he fell, his head struck the metal leg of a table, and he received an electric shock from one of the deployed taser wires).

The Commonwealth charged Appellant with the aforementioned crimes, as well as assault of a law enforcement officer (assault/police) and riot.[2] The Commonwealth withdrew the charge of assault/police at Appellant's preliminary hearing.

The matter proceeded to trial, where Attorney Robert E. Goldman (defense counsel) represented Appellant. During jury selection, defense counsel raised an objection at sidebar, invoking *Batson v. Kentucky*, 476 U.S. 79, 87-89 (1986) (holding prosecution's challenge to potential jurors solely on basis of race violated Equal Protection Clause of the United States Constitution).[3] According to defense counsel, "Three [Commonwealth juror]

---

[2] *See* 18 Pa.C.S.A. §§ 2702.1(a), 5501(2).

[3] Our Supreme Court has explained, "the harm *Batson* seeks to avoid is not only a trial where members of the defendant's own race have been excluded from the jury on account of their race, but also the harm to the prospective jurors and the community at large that results when citizens are denied participation in jury service based upon their race." *Commonwealth v. Sanchez*, 36 A.3d 24, 44 (Pa. 2011) (citation omitted).

challenges out of seven are Latinos, [and Appellant] is a Latino[.]" N.T., 5/31/22, at 42-43.

The prosecutor informed the trial court that she had "non-discriminatory reasons" for challenging the three jurors, including that jurors number 12 and 18 had expressed views "negative to police." N.T., 5/31/22, at 43-45. With respect to the two jurors, the trial court replied, "we don't know if [they are] Hispanic or not." *Id.* at 46. However, the trial court **disagreed** with the prosecutor as to the third juror (juror number 6), stating "there's no legitimate reason. You can't give a *Batson* reason…." *Id.* at 46-47; *see also id.* at 47 (trial court cautioning the prosecutor: "That's not good."). The prosecutor agreed to defense counsel's request that juror number 6 be placed "back on the jury." *Id.* at 47. The trial court then asked defense counsel: "So you're done with the objection?" *Id.* at 48. **Defense counsel replied, "There's satisfaction on the record. Yes, Your Honor."** *Id.* (emphasis added). Thereafter, the jury was empaneled and trial began. The jury found Appellant guilty of the above crimes.[4]

On July 13, 2022, the trial court sentenced Appellant to an aggregate 9 – 13 months of incarceration, followed by two years of probation. Appellant did not file post-sentence motions. Appellant filed a timely appeal and complied with Pa.R.A.P. 1925(b).

---

[4] The trial court entered a directed verdict on the riot charge. N.T., 6/1/22, at 166-67.

Appellant presents two issues for review:

1. Did the Trial Court err when it found that the Commonwealth presented sufficient evidence to support the charges of Aggravated Assault 18 Pa.[C.S.A. §] 2702(a)(3) and Simple Assault 18 Pa.[C.S.A. §] 2701(a)(1)?

2. Did the Trial Court err when it failed to determine Appellant's *Batson* challenge on two (2) jurors, instead only addressing one (1)?

Appellant's Brief at 5 (issues reordered for disposition).

Appellant first claims his convictions for aggravated assault and simple assault were not supported by sufficient evidence. *See id.* at 18-22. According to Appellant:

There was no evidence presented concerning any threats made by Appellant to Officer Kinnel, no evidence that Appellant continued to pursue Officer Kinnel, nor any evidence that Officer Kinnel had to make any attempts to escape Appellant. … The evidence presented simply shows trivial contact between Appellant and Officer Kinnel that occurred incident to an attempt to arrest.

*Id.* at 22; *see also id.* (claiming Appellant's "conduct was not assaultive or violent"). Appellant relies on *Commonwealth v. Wertelet*, 696 A.2d 206 (Pa. Super. 1997), asserting it is "factually similar." Appellant's Brief at 20-21.

When reviewing a sufficiency challenge,

we evaluate the record in the light most favorable to the Commonwealth as verdict winner, giving it the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Any doubt about the defendant's guilt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter

- 8 -

of law, no probability of fact can be drawn from the combined circumstances. Additionally, the Commonwealth may sustain its burden solely by means of circumstantial evidence.

*Commonwealth v. Lake*, 281 A.3d 341, 346 (Pa. Super. 2022) (citations and quotations omitted). "On appeal, this Court evaluates the full record to determine whether sufficien[t] evidence was presented to support each element of the crime charged; however, we do not second-guess the jury's factual determinations." *Commonwealth v. Risoldi*, 238 A.3d 434, 454 (Pa. Super. 2020). "Finally, the finder of fact, while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." *Commonwealth v. Smith*, 206 A.3d 551, 557 (Pa. Super. 2019) (citation omitted).

The Crimes Code provides that a person commits aggravated assault if he "attempts to cause or intentionally or knowingly causes bodily injury to any of the officers, agents, employees or other persons enumerated in subsection (c), in the performance of duty[.]" 18 Pa.C.S.A. § 2702(a)(3); *see also id.* § 2702(c)(1) (specifying police officers as protected persons). "Bodily injury" is defined as "[i]mpairment of physical condition or substantial pain." *Id.* § 2301. This Court has instructed:

> [I]n a prosecution for aggravated assault on an officer, the Commonwealth has no obligation to establish that the officer actually suffered a bodily injury; rather, the Commonwealth must establish only an **attempt** to inflict bodily injury, and this intent may be shown by circumstances which reasonably suggest that [an appellant] intended to cause injury.

*Commonwealth v. Rahman*, 75 A.3d 497, 502 (Pa. Super. 2013) (emphasis in original; citation, quotation marks, and brackets omitted); *see also Commonwealth v. Brown*, 23 A.3d 544, 560 (Pa. Super. 2011) (*en banc*) (same).

The Crimes Code provides that a person commits simple assault if he "attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another[.]" 18 Pa.C.S.A. § 2701(a)(1); *accord Commonwealth v. Marti*, 779 A.2d 1177, 1182-83 (Pa. Super. 2001) (explaining a defendant's assault on a police officer may warrant a conviction of simple assault under Section 2701(a)(1), and a conviction of aggravated assault under Section 2702(a)(3)).

Instantly, the trial court explained its rejection of Appellant's sufficiency challenge:

> [T]he evidentiary record overwhelmingly establishes [Appellant's] guilt [of aggravated assault and simple assault]. … Officer Kinnel testified that as he approached [Appellant], announcing that [Appellant] was being arrested, [Appellant] pushed Officer Kinnel out of the doorway to the apartment building, onto the floor of the porch, and then turned to run into his apartment on the second floor. The incident was captured on cell phone video and clearly depicted [Appellant] pushing Officer Kinnel and Officer Kinnel falling out of the doorway onto the porch floor.
>
> [The defense theory at trial,] … to justify [Appellant's] physical contact with Officer Kinnel, [was that Appellant purportedly] was trying to aid or respond to [Appellant's] mother[,] who had also fallen onto the porch and was lying behind Officer Kinnel. Unfortunately for [Appellant], **the video captured [Appellant] pushing Officer Kinnel** back, then turning and running in the opposite direction into the apartment building

where [Appellant] then ran up to his second floor apartment. Thus, the [defense's theory] as to [Appellant's] intent for creating contact with Officer Kinnel was contradicted by the video.

Trial Court Opinion, 10/5/22, at 4 (emphasis added). The record and law support the trial court's reasoning. Thus, the trial court did not abuse its discretion in rejecting Appellant's sufficiency claim.

We further disagree with Appellant's reliance on *Wertelet*, *supra*, to support reversal of his convictions. The defendant in *Wertelet* kicked the arresting officer in the shin while resisting arrest. *Wertelet*, 696 A.2d at 208, 212. We held that this "relatively harmless physical contact" did not constitute "bodily injury" as defined by the aggravated assault statute. *Id.* at 210, 212. However, we did not squarely address in *Wertelet* whether the defendant **attempted** to cause bodily injury to the officer.

As discussed above, it was the Commonwealth's burden to establish that Appellant **attempted** to inflict bodily injury, and such intent "may be shown by circumstances which reasonably suggest [Appellant] intended to cause injury." *Rahman*, *supra*; *see also Brown*, *supra*. The evidence in this case stands in stark contrast to *Wertelet*. Appellant (1) threatened to "beat [Officer Kinnel's] ass"; (2) ran from Officer Kinnel to prevent him from lawfully arresting Appellant for disorderly conduct; and (3) shoved Officer Kinnel out the doorway of Appellant's home, **causing Officer Kinnel to fall on a concrete porch and hit his head on a metal table leg**. *See generally* N.T., 11/1/21, at 106-18, *supra*. This evidence was sufficient to establish

Appellant's attempt to inflict bodily injury. Indeed, Appellant injured Officer Kinnel. *Id.* at 118-19, 120 (Officer Kinnel stating the taser "wires actually wrapped up around my neck" (mildly shocking him and causing pain), he "hit the back of [his] head on … the metal table leg," and the fall caused the officer to be "a little" disoriented).

Finally, Appellant's decision to flee from police and attempt to hide in his home supported an inference of his consciousness of guilt. *See Commonwealth v. Laird*, 988 A.2d 618, 627 (Pa. 2010) (flight and concealment can constitute circumstantial proof of consciousness of guilt). Appellant's first issue lacks merit.

In his second issue, Appellant argues the trial court erred in rejecting his *Batson* challenge. *See* Appellant's Brief at 15-18. According to Appellant,

> a *prima facie* case was established, and the prosecution was asked by the [trial c]ourt to present a neutral explanation for its use of peremptory challenges for three jurors. Said explanations were presented. The [c]ourt challenged the prosecution's neutral explanations, and seemingly disavowed said presented reasons, but ultimately only truly made a determination on one of the three jurors[, *i.e.*, juror number 6,] before asking if placing … juror [number] 6 back on the jury would solve the issue. … [T]he trial court erred when it failed its duty to determine if Appellant had established purposeful discrimination as to all three of the juror strikes that were challenged by Appellant, instead only following through on the required analysis for one (1) of the three (3) challenges.

*Id.* at 18.

When reviewing an issue involving a *Batson* challenge, we examine "whether the trial court's legal conclusions are correct and whether its factual

- 12 -

findings are clearly erroneous." ***Commonwealth v. Edwards***, 177 A.3d 963, 970 (Pa. Super. 2018).

> Great deference must be given to the trial court's finding as to an absence of discriminatory intent in peremptory challenges, and this finding will not be overturned unless clearly erroneous. Such deference is warranted because the trial court is in the position to make credibility determinations when viewing the demeanor of the prosecutor exercising the peremptory challenges.

***Commonwealth v. Towles***, 106 A.3d 591, 602 (Pa. 2014) (citations omitted).

> The evaluation of a ***Batson*** challenge involves a three-prong test:
>
> [F]irst, the [a]ppellant must make a *prima facie* showing that the circumstances give rise to an inference that the prosecutor struck one or more prospective jurors on account of race; second, if the *prima facie* showing is made, the burden shifts to the prosecutor to articulate a race-neutral explanation for striking the juror(s) at issue; and third, the trial court must then make the ultimate determination of whether the defense has carried its burden of proving purposeful discrimination.

***Commonwealth v. Williams***, 980 A.2d 510, 529-30 (Pa. 2009) (citing ***Batson****,* 476 U.S. at 97)). A trial court should consider the "totality of circumstances" when determining whether the prosecution acted with discriminatory intent or engaged in purposeful discrimination. ***Id.*** at 531-32.

> The Commonwealth counters:
>
> Appellant utterly failed to present any of the necessary information to make the required *prima facie* showing. [According to] Appellant[,] … three stricken jurors had "Hispanic, Latino last names" and "[t]hree challenges out of seven are Latinos." N.T., 5/31/22, at 42-43. Appellant never identified the race of the other four potential jurors struck by the Commonwealth or the race of the jurors struck by the defense, nor did he provide any information about the racial composition of the final jury selected.

*See* Trial Court Opinion, 10/5/22, at 2. Because Appellant failed to make the required record to satisfy the first [***Batson***] prong, he has failed to properly preserve his claim for appellate review, and is not entitled to relief. *See* [***Commonwealth v.***] ***Hackett***, 735 A.2d [688,] 694 [(Pa. 1999)]; ***Commonwealth v. Jones***, 668 A.2d 491, 518 (Pa. 1995) (finding appellant failed to create adequate record to satisfy requirement of establishing *prima facie* ***Batson*** case); ***see also Commonwealth v. Spence***, 627 A.2d 1176, 1182 (Pa. 1993) [(overruled on other grounds by ***Commonwealth v. Walker***, 92 A.3d 766, 781 (Pa. 2014)).]

Commonwealth Brief at 11 (footnote omitted).

Similarly, the trial court explained:

At the conclusion of the jury selection process, defense counsel raised a ***Batson*** objection claiming that the Commonwealth had made preemptory challenges striking three (3) jurors who had apparent Hispanic last names, specifically jurors [number] 6, 12 and 18. Defense counsel did not make a presentation with regard to the total number of Hispanic jurors in the jury pool or the composition of the selected jury.

[The trial court] first requested the District Attorney to present her non-discriminatory basis for making her selections. In defense of her selections, the District Attorney noted that there were Hispanic jurors seated on the jury that she did not strike. **The District Attorney also stated that jurors number 12 and 18 were stricken because of answers they provided on the juror questionnaire form which indicated they were negative towards the police.** As far as juror number 6, the District Attorney indicated that that selection was random, as she had no negative information about the juror; and in fact, the District Attorney commented that she believed that juror number 6 would be a favorable juror for the Commonwealth.

[The trial court] **overruled** the Commonwealth['s] preemptory challenge of juror number 6, [and] add[ed] him back to the trial jury. No further discussion was presented by counsel[, so **the trial court] asked defense counsel: "Do I resolve this issue if I put [juror] number 6 back on the jury?" Defense counsel responded: "I would be satisfied with that."** Thereafter, [the trial court] again inquired of defense counsel: "So you're done with the objection?" Defense counsel responded:

- 14 -

"There is satisfaction on the record." The above exchange indicated that the objection was resolved to [defense] counsel's satisfaction.

No post-trial motion was filed. Therefore, this alleged *Ba[ts]on* error was not preserved or resolved in a post-sentence motion. Therefore, we believe that the issue is waived on appeal. [*See Jones*, 668 A.2d at 518, *supra* (holding defendants raising *Batson* claim have the burden of "creat[ing] an adequate record at trial" with respect to the matter); *see also* Pa.R.A.P. 302(a) (issues cannot be raised for the first time on appeal).] **Further, because defense counsel did not respond to or challenge the proffer made by the District Attorney that the strikes for jurors [number] 12 and 18 were for non-discriminatory reasons, [the trial court] cannot delve further into a *Batson* analysis**.

Trial Court Opinion, 10/5/22, at 2-3 (emphasis added; some capitalization altered).

The record supports the trial court's analysis. ***See id.***; ***see also*** N.T., 5/31/22, at 43-45, and ***id.*** at 46 (trial court stating, "we don't know if [the jurors are] Hispanic or not."). Contrary to Appellant's claim, the trial court did not "err[] when it failed its duty to determine if Appellant had established purposeful discrimination as to all three of the juror strikes." Appellant's Brief at 18. Appellant's second issue does not merit relief.

Judgment of sentence affirmed.

- 15 -

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>6/9/2023</u>