J-S27010-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA   :   IN THE SUPERIOR COURT OF
                                         :           PENNSYLVANIA
                                         :
                 v.                      :
                                         :
                                         :
RICHARD ANDRE KENNEDY         :
                                         :
              Appellant        :      No. 1451 WDA 2019

Appeal from the Judgment of Sentence Entered August 22, 2019
In the Court of Common Pleas of Venango County Criminal Division at
No(s): CP-61-CR-0000725-2017

BEFORE:    OLSON, J., NICHOLS, J., and COLINS, J.[*]

MEMORANDUM BY OLSON, J.:            **FILED: JANUARY 25, 2022**

Appellant, Richard Andre Kennedy, appeals from the judgment of

sentence entered on August 22, 2019, following his jury trial convictions for

first-degree murder, second-degree murder, aggravated assault, kidnapping,

possession of an instrument of crime, possession of a prohibited offensive

weapon, abuse of corpse, and tampering with physical evidence.[1] We affirm.

We briefly summarize the facts and procedural history, as gleaned from

the certified record, as follows. On October 27, 2017, police were called to a

residence on New Street in Venango County. The residents of the home found

blood and physical damage inside the house and were concerned that a

woman named Tausha Baker was potentially missing. Police uncovered blood

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2502(a), 2502(b), 2702(a)(1), 2901(a)(2), 907(a), 908(a), 5510, and 4910(1), respectively.

spatter, bloody clothing, and Baker's tooth in the first floor of the residence and a damaged frying pan from the yard. That same day, officers responded to a call that there was a brush fire at a wooded garbage dump site on Waterworks Road in Venango County, several miles from the residence on New Street. Police recovered Baker's severely burned body at that site. An autopsy later revealed Baker sustained blunt force trauma to her head and was stabbed multiple times in the head, neck, and torso. While police were investigating at the New Street residence, Appellant and Amanda Cypher, Appellant's girlfriend and the co-defendant in this matter, arrived near the location together. Cypher was apprehended and Appellant ran.

Cypher gave several audio and video recorded statements to police about the incident and ultimately testified against Appellant at a 13 day trial in April 2019. Cypher testified that Appellant hit Baker five times in the head with a frying pan in the kitchen of the New Street residence and then got on top of her and hit her in the face multiple times with his fists. N.T., 4/10/2019, at 103-105. Appellant then bound Baker's arms and legs with duct tape. *Id.* at 106. Appellant carried Baker out of the house, got in the backseat of a maroon SUV with Baker, and told Cypher to drive toward the woods. *Id.* at 116-117. Appellant additionally bound Baker's hands with a white phone charger cord that was inside the vehicle. *Id.* at 123. Appellant told Cypher to stop the vehicle on Waterworks Road. *Id.* at 118-119. Appellant stabbed Baker with a knife multiple times in the right shoulder area. *Id.* at 120-121. Appellant also cut his hand. *Id.* at 121. Appellant placed Baker on the ground

- 2 -

and hit her in the head twice with a large rock. *Id.* at 121-122. Cypher complied with Appellant's command to cut the hand bindings and remove Baker's bloody clothing. *Id.* at 123-124. Appellant rolled Baker's body over a hill. *Id.* at 125. Appellant directed Cypher to drive away but ordered her to stop so he could throw the rock, knife, and Baker's cellular telephone off the side of the road. *Id.* at 126. Appellant and Cypher took off articles of their clothing and Appellant hid them on a hillside along with Baker's clothes and a bloody blanket. *Id.* at 127-130. Appellant took a can of gasoline sitting outside a nearby house. *Id.* at 130. Cypher drove Appellant back to Waterworks Road where he set Baker's body on fire. *Id.* at 132. Appellant and Cypher went to several locations afterwards to clean away blood. *Id.* at 133-143. Eventually, Cypher drove Appellant back to Waterworks Road where he set Baker's body on fire again. *Id.* at 146-148. Appellant told Cypher, "No face, no case." *Id.* at 145. While Cypher testified that she smoked crack-cocaine with Appellant preceding the incidents at issue and had been with Appellant while he was intoxicated "quite a few" times before, she claimed he was not acting unusually and did not have trouble communicating before, during, or after the crimes. *Id.* at 91 and 139; *see also* N.T., 4/11/2019, at 17-20; *id.* at 62 ("He was fine.").

Several eyewitnesses corroborated Cypher's timeline of events. One of the residents of the house on New Street saw Cypher drive away in a maroon SUV. N.T., 4/5/2019, at 57-58. A married couple passed a maroon SUV parked on Waterworks Road and saw a man and woman matching descriptions

of Appellant and Cypher standing nearby. *Id.* at 145-146. Police recovered bloody clothing and a blanket from a "hollowed out tree trunk near 15th and Otter Streets." N.T., 4/8/2019, at 78-100. Police also recovered a severed white cellular phone charger cord. *Id.* at 102. Pursuant to a search warrant, police recovered a gasoline can with blood on the handle from the maroon SUV. *Id.* at 32. Subsequent testing revealed that Appellant's DNA was found on the gasoline can. N.T., 4/9/2019, at 544. Blood swabs taken from the house on New Street and from inside the maroon SUV showed the presence of the victim's DNA. *Id.* at 542-558. Upon his arrest, police took fingernail clippings from Appellant and the victim's DNA was later detected under the fingernails of Appellant's right hand. *Id.* at 554. The jury also viewed surveillance recordings police recovered from a residence on Waterworks Road, a daycare near the New Street residence, a gas station, and the security camera from City Hall which showed images of the maroon SUV. *See* N.T., 4/12/2019.

On April 17, 2019, a jury convicted Appellant of the aforementioned crimes. On August 22, 2019, the trial court sentenced Appellant to two concurrent sentences of life imprisonment for the first-degree and second-degree murder convictions.[2] Consecutive to the concurrent terms of

---

[2] *See Commonwealth v. Crissman*, 195 A.3d 588, 594 (Pa. Super. 2018) ("[F]irst and second-degree murder convictions do not merge under 42 Pa.C.S.A. § 9765. First-degree murder requires proof of a specific intent to kill in all cases while second-degree murder does not, and second-degree

life imprisonment, the trial court imposed an aggregate sentence of 71 to 168 years of imprisonment for the remaining crimes.[3]  This timely appeal resulted.[4]

On appeal, Appellant presents the following issues for our review:

I.     Did the trial court err when it failed to suppress evidence of the co-defendant's statement/cooperation, where evidence was purposefully withheld by the Commonwealth?

II.    Did the trial court err in prohibiting the testimony of Dr. Lawrence Guzzardi, related to the defense of voluntary intoxication to the charge of first[-]degree murder?

III.   Did the trial court err in failing to instruct the jury on the defense of voluntary intoxication to the charge of first[-]degree murder, when there was circumstantial evidence of consumption of drugs and alcohol by [Appellant]?

IV.    Was the evidence insufficient in this case to convict [Appellant] of first[-]degree and/or second[-]degree [murder]?

---

murder requires the commission of an enumerated underlying felony while first-degree murder does not.").

[3]  The crimes of aggravated assault and kidnapping merged for sentencing purposes.  The trial court imposed the sentences for the remaining attendant crimes consecutively to each other.

[4]  Appellant filed a notice of appeal on September 19, 2019.  On September 23, 2019, the trial court ordered Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).  Appellant complied timely after the trial court granted a request for an extension in order to acquire the notes of testimony from trial.  Subsequently, the trial court did not issue an opinion pursuant to Pa.R.A.P. 1925(a).  Instead, on December 18, 2020, the trial court filed a statement sur Rule 1925(a) opinion asserting it relied upon the record in all the matters on appeal.  Upon review of the record, on March 12, 2019, the trial court issued a pretrial opinion which specifically addressed the second issue presented on appeal.

Appellant's Brief at 2-3 (complete capitalization omitted; roman numerals added).

In his first issue presented, Appellant claims that the trial court erred in ruling on his motion to dismiss, wherein he alleged the Commonwealth committed a discovery violation in contravention of ***Brady v. Maryland***, 373 U.S. 83 (1963). ***See*** Appellant's Brief at 22-24. Appellant maintains that, before trial, the Commonwealth possessed a written statement that co-defendant Cypher gave to the police but the Commonwealth did not disclose it to Appellant until after the conclusion of the first day of trial. ***Id.*** at 22. Appellant argues that the trial court's reliance on ***Commonwealth v. Burke***, 781 A.2d 1136 (Pa. 2001) was erroneous because "in this case, the failure to turn over [the document] was not the result of confusion between the police and the prosecutor but solely based on an error by the prosecutor." ***Id.*** at 24. Appellant claims that he was prejudiced by the late disclosure and that dismissal of his homicide and related charges is the appropriate remedy for the Commonwealth's ***Brady*** violation. ***Id.*** at 21.

Our standard of review is as follows:

Decisions involving discovery matters are within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. While the trial court retains the discretion to fashion an appropriate remedy when a party has violated the discovery rules, such discretion is not unfettered. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Santos*, 176 A.3d 877, 882 (Pa. Super. 2017).

"[T]here are three necessary components that demonstrate a violation of the **Brady** strictures: the evidence was favorable to the accused, either because it is exculpatory or because it impeaches; the evidence was suppressed by the prosecution, either willfully or inadvertently; and prejudice ensued." **Burke**, 781 A.2d at 1141. In **Burke**, the Pennsylvania Supreme Court further stated:

> Because of the compelling societal interest in prosecuting criminal defendants to conclusion, [our Supreme] Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and [] only in cases of blatant prosecutorial misconduct. As [previously] explained:
>
>> Dismissal of criminal charges punishes not only the prosecutor ... but also the public at large, since the public has a reasonable expectation that those who have been charged with crimes will be fairly prosecuted to the full extent of the law. Thus, the sanction of dismissal of criminal charges should be utilized only in the most blatant cases. Given the public policy goal of protecting the public from criminal conduct, a trial court should consider dismissal of charges where the actions of the Commonwealth are egregious and where demonstrable prejudice will be suffered by the defendant if the charges are not dismissed.
>
> [**Commonwealth v. Shaffer**, 712 A.2d 749, 752 (Pa. 1998)]; *see also Commonwealth v. McElligott*, 432 A.2d 587, 589 (Pa. 1981) ("The remedy of discharge without a fair and complete fact-finding procedure is extreme and will not be invoked absent deliberate bad faith prosecutorial misconduct"); **Commonwealth v. Smith**, 615 A.2d 321, 325 (Pa. 1992) (dismissal of charges is appropriate only where "prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, [or where] the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial").

*Id.* at 1144.

Ultimately, the **Burke** Court concluded:

Rather than prosecutorial misconduct, it appears that [the **Burke**] case primarily involve[d] miscommunication between the police departments involved in the investigation and/or police mishandling of the evidence. The materials were compiled by the Ohio Township police. The Allegheny County police, however, assumed jurisdiction over the investigation several hours after the incident. The prosecutor relied exclusively upon the Allegheny County police to supply her with evidence responsive to the defense's discovery requests. The prosecutor suggested that there may have been some confusion between the departments as to whether the Ohio Township police had, in fact, turned over the items in question to the Allegheny County police. It was also suggested that [a] handwritten statement may have been misfiled by the Allegheny County police in a file on an unrelated matter[. I]t is apparent from the record that it did not result from deliberate misconduct by the prosecutor designed to compel [Burke] into moving for a mistrial or to deprive [him] of a fair trial.

*Id.* at 1145–1146.

In this case, the Commonwealth explained that, after the first day of trial, the prosecutor asked one of the investigating officers if the police were in possession of additional photographs of the co-defendant that had not been turned over. N.T., 4/4/2019, at 4. The officer told the Commonwealth that he had delivered a "blue binder" to the Commonwealth's office the week prior to trial. *Id.* According to the Commonwealth, the officer believed that the Commonwealth already had all of the documents that were contained in the binder. *Id.* at 5; 16. However, upon further inspection of the blue binder after trial began, the Commonwealth found a signed, written statement given to police by co-defendant Cypher. *Id.* at 7-8. As a result, the prosecutor found defense counsel having dinner at his hotel and gave him the documents from the blue binder before the second day of trial. *Id.* at 5. The

- 8 -

Commonwealth argued that the written statement correlated with two audio and video recordings of Cypher's statements to police that were already provided to Appellant during discovery and, therefore, there was no prejudice to Appellant. *Id.* at 8.

The trial court noted:

With respect to what the Commonwealth characterizes as the half-written statement of Amanda Cypher, the alleged co-[d]efendant[,] that it had found in the blue binder[, t]he Commonwealth represents that the information contained therein corelates with the oral statements of Cypher made to Officer [Christopher] Wagner and which Officer Wagner testified that Cypher made to him [on the first day of] trial. The Commonwealth represented moreover that it gave [d]efense [c]ounsel two audio recordings of Cypher's statements prior to trial. When this written statement was discussed at the hearing on [Appellant's oral motion to dismiss], both parties agreed that it would be proper to have Officer Wagner recalled if requested by the defense so that [Appellant] could cross-examine him on the circumstances surrounding Amanda Cypher giving the police this written statement.

*Id.* at 51.

Ultimately, the trial court determined:

While viewing the[] unusually discovered and undisclosed document… in conjunction with the circumstances under which the Commonwealth discovered [it] and the steps they took to immediately apprise [Appellant] of the fact that they found it, the trial court found] that neither granting a dismissal of the case nor granting a mistrial [was] warranted. The Commonwealth did not commit blatant prosecutorial misconduct and did not conceal the existence of [it] from [d]efense [c]ounsel. Rather, the Commonwealth, upon knowledge that the[] document[] and information existed, immediately informed [Appellant.] There was no indication [] that the Commonwealth intentionally or maliciously concealed the document[] and information until after the start of trial. Moreover, the actual document[,] despite the[]

late discovery, [did] not prejudice [Appellant] to warrant dismissal or mistrial.

\* \* \*

Both the Commonwealth and [Appellant] agreed [to recall] Officer Wagner [as a witness] if requested at trial to give testimony to the circumstances leading to Amanda Cypher giving this written statement. And, furthermore, as Amanda Cypher [had] not yet been called at trial, [d]efense [c]ounsel would certainly be able to question [her] about the written statement at trial.

*Id.* at 51-55.

We discern no trial court error or abuse of discretion in denying Appellant's motion to dismiss based upon the late-disclosed written statement by Cypher. Here, similar to the facts of **Burke**, there was miscommunication between the Commonwealth and the police that delayed the disclosure of Cypher's written statement. There was simply no evidence that the Commonwealth engaged in deliberate misconduct. Furthermore, the substance of the statements Cypher made in her written statement were included in audio and video recordings made by the police and produced to Appellant in a timely manner well before trial. As such, Appellant did not demonstrate prejudice by the late disclosure. Thus, we discern no abuse of discretion in denying Appellant's motion to dismiss.

In his second issue presented, Appellant claims the trial court "erred when it prohibited testimony by [his expert,] Dr. Lawrence Guzzardi regarding how intoxication/drug use would have affected [Appellant's] ability to form intent to commit murder, as circumstantial evidence was presented at trial from various witnesses regarding [Appellant's] possible use of drugs and

- 10 -

alcohol." Appellant's Brief at 21. Appellant argues that Dr. Guzzardi "opined in [a] report that [Appellant] could not form the requisite *mens rea* on the date of the murder because he ingested certain drugs and alcohol on the date of the death." *Id.* at 24. Appellant maintains that the trial court erred by precluding Dr. Guzzardi's testimony from trial because he opined in his report that it was "highly unlikely" Appellant could form the requisite intent to commit murder, because the doctor's opinion was based on Appellant's own statements regarding his intoxication. *Id.* at 24-25. Instead, Appellant suggests that "[i]t would have been appropriate to allow Dr. Guzzardi's testimony and allow the jurors to decide whether enough evidence based on the testimony of other witnesses who were with [Appellant] that night to support whether or not he was indeed under the influence of the drugs and/or alcohol on the date in question."[5] *Id.* at 25. To support his argument that the trial court should have allowed Dr. Guzzardi to testify regarding Appellant's ability to form intent on the night in question, Appellant points to the following evidence elicited at trial:

> the owner of the house in which [Appellant] and victim were present [testified] that there was a burned piece of tin foil, which would have indicated drug use[;] another witness stated that he saw drugs in front of [co-defendant] Cypher and[;] there was testimony that [co-defendant] Cypher and [Appellant] were upset that the drugs they had purchased from [victim] Baker were not what they thought they were. [Appellant argues that t]he

---

[5] As will be discussed later, to prove diminished capacity due to voluntary intoxication, a defendant must show that he was overwhelmed to the point of losing his faculties and sensibilities.

testimony throughout the trial indicated a pattern of alcohol usage by persons in the house along with regular drug usage.

*Id.* at 25-26; *see also id.* at 27 ("[R]egarding Dr. Guzzardi's testimony, there were indications throughout the trial that [Appellant] likely could have ingested drugs and alcohol throughout the evening.").

Here, in ruling on Dr. Guzzardi's report and testimony prior to trial, the trial court relied upon our Supreme Court's decision in ***Commonwealth v. Towles***, 106 A.3d 591 (Pa. 2014). ***See*** Trial Court Opinion, 3/12/2019, at 4-7. In ***Towles***, our Supreme Court held:

Decisions regarding the admission of expert testimony are left within the trial court's sound discretion, and [an appellate court] will not disturb such decisions absent a clear abuse of discretion. An expert opinion may be based on inadmissible facts or facts not in evidence, including other expert opinions and hearsay statements, as long as such facts are of a type reasonably relied on by experts in that profession. [T]he trial court [has] sound discretion [] to make a preliminary determination as to whether the particular underlying facts are of a kind reasonably relied upon by experts in the particular field. …If an expert states an opinion, the expert must state the facts or data on which the opinion is based. However, an expert may not act as a mere conduit of hearsay or transmitter of extrajudicial information.

[…Towles'] self-serving statements were not of a type reasonably relied on by experts in toxicology. There is a distinction between an expert using basic facts provided by laymen to form an expert opinion, versus one who simply parrots out-of-court statements in court, thereby acting as a conduit for hearsay. In this case, there were no toxicology screens or tests performed on [Towles]. The expert's report was simply [Towles'] firsthand narrative of the events on the night of the murder and a detailed account of his drug and alcohol consumption that night. Had the expert been permitted to testify to the facts contained in his report, he would have been merely relaying testimony [Towles] would have given had he taken the stand. Pennsylvania's Rules of Evidence do not provide a mechanism for a criminal defendant to decline to testify

and to avoid the rules of evidence by using an expert witness to introduce his story into the record. Accordingly, it was proper for the trial court to exclude the report from the jury's consideration and to prevent [Towles'] statements from reaching the jury via the expert's testimony.

***Towles***, 106 A.3d at 605–606 (internal citations, quotations, and original brackets omitted).

Upon review, we discern no abuse of discretion in the trial court's ruling on Dr. Guzzardi's report and proffered trial testimony. Here, Appellant does not dispute that Dr. Guzzardi's opinions were based solely on Appellant's account of his purported intoxication. Appellant did not testify in this case and, therefore, similarly to ***Towles***, Appellant could not use Dr. Guzzardi as a conduit for hearsay to introduce Appellant's story into the record. Moreover, Appellant simply has not shown there was other evidence to support Dr. Guzzardi's opinions. Appellant admits that the evidence presented at trial showed only that it was **possible** or **likely he could have** ingested drugs and alcohol throughout the evening. Even the circumstantial evidence Appellant cites in his appellate brief – burned aluminum foil in a common area of the house where the crimes originated, narcotics witnessed in front of the co-defendant, and/or a purported dispute with the victim over narcotics - does not support Dr. Guzzardi's proffered opinion that it was highly likely that Appellant's intoxication overwhelmed him to the point of losing his faculties and sensibilities. Aside from his own statements to his expert, Appellant has not shown any evidence to support the admission of Dr. Guzzardi's proffered

opinion. As such, we discern no trial court abuse of discretion and Appellant is not entitled to relief.

Next, Appellant argues that he was entitled to a jury instruction regarding voluntary intoxication since circumstantial evidence of his drug and alcohol use was established. Appellant's Brief at 27. Appellant concedes that a voluntary intoxication instruction is only warranted when there is evidence that such intoxication overwhelmed the defendant to the point of losing his faculties and sensibilities. *Id.* He claims, however, in this case, "[t]he testimony regarding foil, purchasing drugs that evening, and the presence of alcohol in the house where [Appellant] was for hours that evening supports [his claim] that this instruction should have been given for consideration by the jury." *Id.* at 27-28.

"[O]ur standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Galvin*, 985 A.2d 783, 788-789 (Pa. 2009). Our Supreme Court has previously determined:

> A defense of diminished capacity negates the element of specific intent, and thus mitigates first-degree murder to third-degree murder. The mere fact of voluntary intoxication does not give rise to a diminished capacity defense. Rather, to prove diminished capacity due to voluntary intoxication, a defendant must show that he was overwhelmed to the point of losing his faculties and sensibilities. Evidence that the defendant lacked the ability to control his or her actions or acted impulsively is irrelevant to specific intent to kill, and thus is not admissible to support a diminished capacity defense.

> [Our Supreme] Court has previously made clear that a jury instruction regarding diminished capacity due to voluntary intoxication is justified only when the record contains evidence that the accused was intoxicated to the point of losing his or her faculties or sensibilities. Evidence that the accused ingested alcohol or other intoxicating drug—without more—does not warrant a voluntary intoxication instruction[, especially when] there [is] no evidence that the [accused] exhibited any signs of intoxication or unusual behavior.

*Commonwealth v. Padilla*, 80 A.3d 1238, 1263 (Pa. 2013) (internal citations and quotations omitted).

Here, as discussed at length regarding Appellant's proffered expert toxicologist, Dr. Guzzardi, aside from Appellant's own statements, there was no evidence presented at trial that Appellant was intoxicated to the point of losing his faculties or sensibilities. The mere fact that Appellant ingested alcohol or controlled substances prior to the crimes did not give rise to a diminished capacity jury instruction. In this case, there was no evidence presented that Appellant exhibited signs of intoxication or unusual behavior. Accordingly, the trial court properly declined to instruct the jury regarding diminished capacity due to voluntary intoxication.

In his last argument on appeal, Appellant contends that there was insufficient evidence to support his murder convictions. Appellant's Brief at 28-31. He claims that the Commonwealth "did not prove beyond a reasonable doubt that [Appellant] was in fact the individual that struck or killed [] Baker." *Id.* at 29. Appellant claims the Commonwealth offered "no specific reason" for Appellant to kill Baker and, therefore, failed to establish he possessed the specific intent to kill. *Id.* at 31. Rather, Appellant argues that "the evidence

pointed to the possibility that Amanda Cypher, who testified that she was present at all times throughout this situation, actually killed [] Baker due to [a debt dispute]." *Id.* at 28-29.

This Court has previously stated:

[W]e must determine whether the evidence admitted at trial, and all reasonable inferences drawn therefrom, when viewed in a light most favorable to the Commonwealth as verdict winner, support the conviction beyond a reasonable doubt. Critically important, we must draw all reasonable inferences from the evidence in favor of the Commonwealth as the verdict-winner. Where there is sufficient evidence to enable the trier of fact to find every element of the crime has been established beyond a reasonable doubt, the sufficiency of the evidence claim must fail. Of course, the evidence established at trial need not preclude every possibility of innocence and the fact-finder is free to believe all, part, or none of the evidence presented.

The Commonwealth can meet its burden by wholly circumstantial evidence and any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances. It is improper for this Court to re-weigh the evidence and substitute our judgment for that of the fact-finder. Additionally, the entire record must be evaluated and all evidence actually received must be considered.

*Commonwealth v. Watley*, 81 A.3d 108, 113 (Pa. Super. 2013) (*en banc*) (internal citations and quotations omitted).

Our Supreme Court has held:

In order to sustain a conviction for first[-]degree murder, the Commonwealth must prove (1) that the defendant acted with a specific intent to kill; (2) that a human being was unlawfully killed; (3) that the person accused did the killing; and (4) that the killing was done with deliberation. Specific intent to kill can be proven where the defendant knowingly applies deadly force to the person of another. Death caused by the use of a deadly weapon upon a vital part of the victim's body is sufficient to prove the specific

- 16 -

intent required for a conviction of first[-]degree murder. Furthermore, all co-conspirators to a murder may be found guilty of first[-]degree murder, regardless of which person actually inflicted the wound which resulted in death.

*Commonwealth v. Small*, 741 A.2d 666, 672 (Pa. 1999) (internal citations and quotations omitted).

Here, viewing the evidence as set forth in detail above in the light most favorable to the Commonwealth as the verdict winner, as our standard of the review requires, the Commonwealth established Appellant was the person that applied deadly force to the victim.[6] The evidence introduced at trial showed that Appellant hit the victim in the head with a frying pan and his fists, stabbed her upper torso multiple times with a knife, crushed her head with a large rock, and set her body on fire twice with gasoline. The jury was free to believe all, part, or none of the evidence presented and we may not substitute our judgment for the fact-finder's determinations. Moreover, a co-conspirator may be found guilty of murder, regardless of which person actually inflicted the wound which resulted in death. Appellant does not refute that he was present for the murder. As such, Appellant's suggestion that Cypher possibly killed Baker is immaterial and does not entitle him to relief. Moreover, the Commonwealth presented evidence at trial that soon after the murder the police recovered samples of the victim's DNA from underneath Appellant's fingernails. Accordingly, we conclude that the trial court presented sufficient

_____

[6] Appellant does not refute that the victim died from the use of deadly weapons on vital parts of her body.

- 17 -

evidence to support Appellant's murder convictions. Accordingly, Appellant's final issue lacks merit.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/25/2022